IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| MICHAEL PEÑA § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 4:21-cv-00254 |
| § | |
| SPECTRUM REALTY GROUP, LLC; § | |
| NORTHSTAR GROUP, LLC § | |
| § | |
| Defendants. § | |
| § | |

## COMPLAINT AND JURY DEMAND

Plaintiff MICHAEL PEÑA, brings Title VII and ADAA employment discrimination claims and a Texas Fair Housing Act claim against his former employers and landlords, Defendants SPECTRUM REALTY GROUP, LLC and NORTHSTAR GROUP, LLC. Plaintiff demands a trial by jury.

In support of his claims, Plaintiff states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Michael Peña is an individual residing in Dallas County, Texas.

2. Defendant Spectrum Realty Group, LLC ("Spectrum Realty") is a domestic limited liability corporation doing business in Dallas-Fort Worth and Collin County, Texas.

3. Defendant Northstar Group, LLC ("Northstar") is a domestic limited liability corporation doing business in Dallas-Fort Worth and Collin County, Texas.

4. This Court has jurisdiction over Plaintiff's Federal claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 12101, et. seq. This Court also has supplemental

jurisdiction over Plaintiff's Texas Fair Housing Act claim pursuant to 28 U.S.C. § 1367.

5. Venue is proper in the Sherman Division of the Eastern District of Texas as the unlawful employment practices alleged in this Complaint took place in Collin County, Texas.

## **FACTS**

6. On June 4, 2018, Defendants Spectrum Realty and Northstar hired Plaintiff Michael Peña to work as a Bilingual Leasing Manager at Creekside Village Apartments in Plano, Texas.

7. Defendants also began leasing one of the Creekside Village Apartments to Mr. Peña at this time.

8. Mr. Peña is bilingual, Hispanic, and gay.

9. Instead of treating Mr. Peña with respect and professionalism, the women employed by Defendants at the Creekside Village Apartments began harassing Mr. Peña due to his sexual orientation.

10. Assistant Property Manager Chantelle McDaniels and another woman in the office often picked on Mr. Peña for being gay.

11. McDaniels and another woman in the office repeatedly told Mr. Peña that he would never know how it feels to have children because he is gay.

12. On one occasion, McDaniels slapped Mr. Peña's buttocks while he was bending over at the filing cabinet.

13. When Mr. Peña protested and asked McDaniels why she had done that, she laughed out loud at him.

14. McDaniels was under the influence of alcohol or marijuana at the time.

15. From Mr. Peña's observations, it appeared that McDaniels came to work under the influence of alcohol or marijuana almost every work day.

16. The Property Manager Kristin Ashby knew that McDaniels came into work under the influence of alcohol and/or marijuana.

17. Ashby allowed McDaniels to get away with this and other unprofessional behavior.

18. Ashby never once wrote up, disciplined, or sent McDaniels home for coming into work under the influence.

19. Instead, Ashby required Mr. Peña to do McDaniels' work on top of his own, and began writing Mr. Peña up.

20. Ashby also gave the women in the office preferential treatment as compared to Mr. Peña.

21. Mr. Peña was required to work seven days a week, miss his Grandmother's funeral, and work through all the major holidays including Thanksgiving, Christmas, and New Year's.

22. Ashby however let the women in the office take time off for holidays, come in late, miss work, leave to go home for lunch breaks, leave to go home to pick up their children, and otherwise have a great deal of flexibility in their schedules.

23. Mr. Peña was not given the same flexibility in his schedule.

24. Ashby instead even went so far as to require Mr. Peña to come in on his day off without paying him for working the extra time.

25. Two of the female leasing consultants who worked at the office took this harassment of Mr. Peña to the next level by making offensive jokes about Mr. Peña's sexual orientation in front of the apartments' residents.

26. Specifically, these two leasing consultants told one of the residents that Mr. Pena gets his leases by going down to the playground in his wig and in drag being all gay and asking the men to come into the office to show them an apartment and maybe to do more to have them make a faster decision.

27. Mr. Peña asked McDaniels, Ashby, and a Regional Supervisor Mary Proctor for help stopping the disrespectful behavior of the two leasing consultants.

28. McDaniels told Mr. Peña to just leave things alone.

29. Proctor told Mr. Peña to talk to Ashby about the issue.

30. Proctor had previously told Mr. Peña not to complain about how he was being treated at the office if he needed a place to live.

31. Mr. Peña therefore did not reasonably feel that he could push the issue of the anti-gay harassment with Proctor any further.

32. Mr. Peña instead did what Proctor told him to do and contacted Ashby.

33. Ashby told Mr. Peña she didn't have time to deal with those sort of things.

34. Following Mr. Peña's complaint about the leasing consultants' behavior, McDaniels slapped Mr. Peña's buttocks again in the middle of the workday.

35. McDaniels slapped Mr. Peña's buttocks much harder than the first time she had slapped his buttocks.

36. In reaction to McDaniels slapping him that hard, Mr. Peña yelled out for Ashby to intervene on his behalf.

37. Ashby did not even come out to see what was wrong.

38. Proctor, the Regional Manager who refused to help Mr. Peña with his concerns

about the two leasing consultants' offensive behavior, then sent an e-mail to Mr. Peña informing him that he could no longer speak Spanish in the office.

39. Mr. Peña had been hired as a bilingual Leasing Manager because of his ability to communicate in Spanish to LatinX residents of the apartment complex.

40. 65% or more of the residents at Defendants' Creekside Village Apartments complex in Plano are Latinx.

41. In November of 2018, Mr. Peña had a nervous breakdown due to the ongoing stress of the workplace harassment.

42. Mr. Peña went to Urgent Care that day for treatment.

43. Mr. Peña called Ashby from the Urgent Care to let her know he would not be able to come into work that day because he was at Urgent Care.

44. Ashby made Mr. Peña cry by intimidating and harassment Mr. Peña about being sick.

45. Seeing Mr. Peña's distress, the doctor at the Urgent Care took the phone from Mr. Peña and told Ashby that Mr. Peña did not need any more stress and to please stop.

46. Ashby yelled at the doctor that Mr. Peña was just making it up just to get the day off.

47. Mr. Peña returned to work the next day and provided the hospital information to Defendants at Defendants' request.

48. Mr. Peña again attempted to get help from Regional Manager Mary Proctor about the harassment going on at the office.

49. Proctor ignored Mr. Peña.

50. McDaniels then escalated her harassment of Mr. Peña.

51. While Mr. Peña was in the office working, McDaniels came up to Mr. Peña and put her whole hand down the back of Mr. Peña's pants reaching his buttocks and then his genitals.

52. McDaniels laughed as she reached down Mr. Peña's pants.

53. Mr. Peña asked McDaniels why she kept harassing him like that.

54. McDaniels replied "You are gay aren't you? I just wanted to know what type of underwear you wear to be able to get all those leases. Gay people are supposed to like it anyway."

55. In December 2018, Mr. Peña went to the Emergency Room because of the stress of the ongoing harassment.

56. On December 30, 2018, Mr. Peña, while still in significant emotional distress, sent an e-mail to Defendants in which he reported a number of concerns about his employment situation, including how much it hurt to be put down everyday, to see the women the office given more favorable treatment, and to have to question whether his boss didn't like him because he was a man, because he was Hispanic, or because he was gay.

57. Due to the contents of the e-mail, Defendants knew, or certainly should have known, that Mr. Peña wrote the e-mail while in mental distress.

58. Ashby knew that Mr. Peña had been experiencing hour long black-outs and other serious health symptoms requiring urgent and emergency care.

59. Defendants however did not reach out to Mr. Peña to make sure he was okay, but instead let his calls go to voicemail and go unanswered.

60. On January 3, 2019, Defendants held a human resources meeting with Mr. Peña.

61. Mr. Peña reported additional concerns during this meeting including concerns

about the sexual harassment he had experienced from McDaniels, who had since resigned her position with the company.

62. At the meeting, Defendants had Mr. Peña sign a document that they intended to use to protect the company against future claims of liability.

63. Defendants did not, however, actually take any corrective steps to prevent future harassment or discrimination in the workplace.

64. Instead, the new female Assistant Property Manager started slapping Mr. Peña's buttocks just like McDaniels had.

65. When Mr. Peña asked the new Assistant Property Manger why she had slapped his buttocks, she replied "oh whatever Michael. Like you didn't like it."

66. Shortly after this incident, Defendants went back in time to December 2018 and wrote Mr. Peña up for the days he was absent in December.

67. On April 13, 2019, Mr. Peña reported to the emergency room again.

68. That same day, on April 13, 2019, Mr. Peña called the Assistant Property Manager at the Creekside Village Apartments office to notify her that he was in the hospital.

69. On April 15, 2019, Mr. Peña called Ashby twice to notify her of his ongoing medical crisis.

70. On April 15, 2020, Mr. Peña also had multiple telephone conversations with Defendants' Human Resources Manager Chrissy Long.

71. As a result of these April 15, 2019 telephone calls with Mr. Peña, Long knew that Mr. Peña had been to the emergency room, was under a doctor's care for medical conditions that

were disabling him from working, and that Mr. Peña needed to request a short-term disability leave of absence from work.

72. On April 15, 2019, Long filled out the employer section of a short-term disability benefits application for Mr. Peña and e-mailed Mr. Peña the short-term disability benefits paperwork for his doctor to fill out.

73. By April 17, 2019 at 8:04am, Long had received, via e-mail, from Mr. Peña:

   a. a doctor's note from Mr. Peña's doctor stating that Mr. Peña needed a leave of absence from April 13, 2019 through May 16, 2019, and

   b. the short-term disability paperwork as completed by Mr. Peña's doctor which identified Mr. Peña as needing the leave of absence due to an adjustment disorder, anxiety, and depression that was making it difficult for Mr. Peña to take care of himself and necessitated a course of medication and counseling.

74. Long then proceeded to have a sixteen-minute long telephone call with Mr. Peña on April 18, 2019.

75. Mr. Peña informed Long that he felt his mental health breakdown stemmed from the prior harassment he had experienced while working for Defendants.

76. Instead of approving the leave of absence Mr. Peña needed due to his mental health disabilities, Long decided to terminate Mr. Peña's employment and evict Mr. Peña from his apartment.

77. Long then posted a NorthStar and Spectrum Realty termination notice and eviction notice on Mr. Peña's apartment door.

78.     The termination notice, which was dated April 19, 2019, stated that Defendants had terminated Mr. Peña's employment for excessive absenteeism for being absent from April 13 through April 17, 2019.

79.     The eviction notice, which was dated April 22, 2019, stated that Mr. Peña had three days to vacate his apartment.

80.     As a result, Mr. Peña lost both his job and his apartment while experiencing a mental health crisis that required both medication and counseling.

81.     On August 13, 2019, Mr. Peña filed a formal Charge of Discrimination with the EEOC against Defendants.

82.     On November 25, 2019, Brian Cunningham, Defendants' Vice President, submitted a Position Statement to the EEOC defending the company's actions.

83.     Mr. Cunningham told the EEOC that Mr. Peña had been terminated because Mr. Peña "began missing days of work and failed to notify his supervisor he would not be in or when he would be able to return to work."

84.     Mr. Cunningham failed to inform the EEOC that Mr. Peña had communicated directly with Defendants' Human Resources Manager Chrissy Long about both his absences and when he would be able to return to work (May 19th).

85.     Mr. Cunningham failed to inform the EEOC that Long had in fact received short-term disability paperwork from Mr. Peña's doctor identified Mr. Peña's disabilities and need for a leave of absence through May 19, 2019.

86.     Mr. Cunningham failed to produce any of Long's e-mail communications with Mr. Peña to the EEOC.

87. Mr. Cunningham failed to produce the doctor's note or short-term disability benefits paperwork Mr. Peña had turned into Long to the EEOC.

88. The EEOC eventually concluded its investigation and issued Mr. Peña a Right-to-Sue Notice on January 22, 2021.

89. Mr. Peña then sought out assistance from legal counsel to file this Complaint.

## FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION & FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADAA

**(Against Both Defendants)**

90. Defendant Spectrum Realty Group, LLC is an "employer" as defined by the ADAAA.

91. Defendant Spectrum Realty Group, LLC at all relevant times had more than 15 employees.

92. Defendant Northstar Group, LLC is also an "employer" as defined by the ADAA.

93. Defendant Northstar Group, LLC at all relevant times also had more than 15 employees.

94. During his employment at Defendants' Creekside Village Apartments, Plaintiff was at all relevant times an employee of both Defendant Spectrum Realty Group, LLC and NOrthstar Group, LLC

95. Defendants were a joint and/or integrated employer.

96. Defendants share LLC members, management personnel, employees, employee benefit plans, personnel policies, and other aspects of labor relations.

97. Kathy Cunningham is both the President of Spectrum Realty Group and a the President of Northstar Group.

98. Brian Cunningham is both the Vice President of Spectrum Realty Group and a Managing Member of Northstar Group.

99. Defendants share the same human resources department, the same employee benefit plans, the same personnel policies, and share other management, legal, and labor relation resources.

100. Throughout his employment with Defendants, Plaintiff was a qualified individual with a disability as defined by the ADAAA.

101. Plaintiff suffered from several mental impairments which substantially limited one or more major life activities, including his ability to work, care for himself, and stay organized and focused.

102. Plaintiff, however, at all times remained fully capable of performing the essential job functions of his Bilingual Leasing Manager position with reasonable accommodations.

103. The short-term and definitive leave of absence Plaintiff needed from April 13, 2019 through May 19, 2019 was a reasonable accommodation as defined by the ADAA and EEOC regulations.

104. Defendants, however failed and refused to make a reasonable workplace accommodation for Plaintiff's known limitations.

105. Defendants also refused to engage in the interactive process of determining whether Plaintiff could be provided the leave of absence he required or another adequate and reasonable workplace accommodation.

106. Defendants had sufficient personnel and resources to allow Plaintiff to take the short-term and finite leave of absence that he requested.

107. Providing Plaintiff this reasonable workplace accommodation would not have created an undue hardship on Defendant.

108. In terminating Plaintiff's employment, Defendants discriminated against Plaintiff because of his actual or perceived disability in violation of the ADAAA.

109. In choosing to terminate Plaintiff's employment instead of provide Plaintiff a reasonable accommodation, Defendants violated the ADAA's requirement that employer provide employees with disabilities reasonable accommodations as well as the ADAA's anti-discrimination provision.

110. Defendants' violation of the ADAA was not a mistake, but instead was willful and intentional.

111. As a result of Defendants' violations of the ADAAA, Plaintiff has suffered actual damages in the form of lost wages and benefits (past and future), added emotional and mental anguish, harm to his career and future career opportunities, humiliation, embarrassment, and a severe affront to his dignity as a person.

112. Plaintiff requests that he be awarded all damages against Defendants that a jury of his peers finds are justified as a remedy for Defendants' violation of his ADAA rights, including lost back and future wages, lost employee benefits, compensatory and punitive damages, interest, and/or equitable relief.

113. Plaintiff also requests reasonable attorney's fees and court costs incurred in prosecuting his civil rights claims.

## SECOND CAUSE OF ACTION –
## RETALIATION IN VIOLATION OF TITLE VII

### (Against Both Defendants)

114. Plaintiff incorporates the preceding paragraphs of the Complaint into this cause of action.

115. Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from retaliating against employees who oppose or report sexual harassment.

116. Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from retaliation against employees who oppose or report gender and sexual orientation discrimination.

117. Defendant Spectrum Realty Group, LLC is an "employer" as defined by Title VII of the Civil Rights Act of 1964, as amended.

118. Defendant Northstar Group, LLC is also an "employer" as defined by Title VII of the Civil Rights Act of 1964.

119. At all relevant times, Defendants Spectrum Realty Group, LLC and NOrthstar Group, LLC were Plaintiff's joint and/or integrated employers under Title VII.

120. Plaintiff reported the sexual harassment and sexual orientation discrimination he experienced as an employee at the Creekside Village Apartments office multiple times, including in writing on December 30, 2018 and verbally on April 17, 2019.

121. Plaintiff had a good faith believe that the conduct directed at him by the women he worked with constituted sexual harassment and sexual orientation discrimination.

122. The conduct did not just occur one time, but occurred frequently and permeated Plaintiff's work environment.

123. In their offensive comments and in explaining their harassing conduct, the women directly cited the fact Plaintiff was gay both in their offensive comments and as a reason for their harassing conduct.

124. Immediately prior to his termination, on or about April 17, 2019, Plaintiff reported to Defendants' Human Resources Manager that he attributed his mental health crisis and symptoms to the sexual harassment and sexual orientation discrimination he experienced as an employee.

125. Defendants had a motive to retaliate against Plaintiff for making these reports because Defendants knew that Plaintiff was attributing serious and real mental health consequences to Defendants' conduct.

126. Defendants knew this could result in Plaintiff seeking to hold Defendant financially liable for his mental health crises.

127. Defendants chose to terminate Plaintiff's employment and deny Plaintiff the leave he requested because of Plaintiff's protected activity of opposing and reporting sexual harassment and sexual orientation discrimination in the workplace.

128. Defendants' violation of Title VII's anti-retaliation provision was not a mistake, but instead was willful and intentional.

129. In violation of the anti-retaliation protections of Title VII, Defendants caused Plaintiff to suffer actual damages in the form of lost wages and benefits (past and future), added emotional and mental anguish, harm to his career and future career opportunities, humiliation, embarrassment, and a severe affront to his dignity as a person.

130. Plaintiff requests that he be awarded all damages against Defendants that a jury of his peers finds are justified as a remedy for Defendants' violation of his Title VII rights, including

lost back and future wages, lost employee benefits, compensatory and punitive damages, interest, and/or equitable relief.

131. Plaintiff also requests reasonable attorney's fees and court costs incurred in prosecuting his civil rights claims.

### THIRD CAUSE OF ACTION –HARASSMENT IN VIOLATION OF TITLE VII

**(Against Both Defendants)**

132. Plaintiff incorporates the preceding paragraphs of the Complaint into this cause of action.

133. Defendants intentionally subjected Plaintiff to unwelcomed harassment because of his sexual orientation and gender.

134. Plaintiff's gender and/or sexual orientation was the reason for Defendants' harassing and hostile treatment of Plaintiff.

135. The harassment affected the terms, conditions or privileges of Plaintiff's employment.

136. The harassment was both verbal and physical, severe and pervasive.

137. Each of the Defendants knew or should have known of the harassment and failed to take prompt remedial action.

138. The harassment created a work environment was both objectively and subjectively offensive such that a reasonable person would have found hostile and abusive, as did Plaintiff.

139. Defendants' violation of Title VII's anti-harassment provision was not a mistake, but instead was willful and intentional.

140. In violation of Title VII, Defendants subjected Plaintiff to a work environment that was so hostile that it caused Plaintiff to suffer severe emotional distress including anxiety and depression and to develop an adjustment disorder, which in turn caused Plaintiff actual damages in the form of lost wages and benefits (past and future) and the denial of his short-term disability benefits (which were denied because his mental health disabilities were deemed "work-related").

141. Plaintiff also suffered harm to his career and future career opportunities, humiliation, embarrassment, and a severe affront to his dignity as a person.

142. As a result of these willful/intentional violations of Title VII, Plaintiff requests that he be awarded all damages against Defendants that a jury of his peers finds are justified as a remedy for Defendants' violation of his Title VII rights, including lost back and future wages, lost employee benefits, compensatory and punitive damages, interest, and/or equitable relief.

143. Plaintiff also requests reasonable attorney's fees and court costs incurred in prosecuting his civil rights claims.

## FOURTH CAUSE OF ACTION- VIOLATION OF TEXAS FAIR HOUSING ACT

### (Against Both Defendants)

144. Plaintiff incorporates the preceding paragraphs of the Complaint into this cause of action.

145. At all relevant times, Defendants were in the business of renting hundreds of residential rental units in the DFW and Collin County area.

146. Defendants rented one of those residential apartments to Plaintiff.

147. Defendants, however, discriminated against Plaintiff in the terms, conditions, and privileges of his rental dwelling in violation of the Texas Fair Housing Act, codified as Texas Property Code section 301.001, et seq..

148. Defendants evicted Plaintiff from his apartment because of his mental health disabilities.

149. Defendants evicted Plaintiff because he reported and opposed Defendants' sexual orientation discrimination and harassment.

150. Defendants' discriminatory and retaliatory eviction of Plaintiff was malicious and effectuated with an intentional disregard for Plaintiff's legal rights.

151. Defendants' violations of the Fair Housing Act caused Plaintiff to suffer an eviction, the loss of his apartment, moving expenses, and other costs in finding a new place to live on an emergency basis.

152. As a result of these willful and intentional violations of Texas' Fair Housing Act, Plaintiff requests that he be awarded all damages against Defendants that a jury of his peers finds are justified as a remedy for Defendants' violation of his Title VII rights, including actual and punitive damages, interest, and/or equitable relief.

153. Plaintiff also requests reasonable attorney's fees and court costs incurred in prosecuting his civil rights claims.

## **JURY DEMAND**

151. Plaintiff Michael Peña requests a trial by jury on all of his causes of action.

/

/

Date:		March 29, 2021		Respectfully submitted,

**TREMAIN ARTAZA, PLLC**

/s/ *Christine A. Hopkins*
**Christine A. Hopkins**
Texas State Bar No. 24095768
christine@tremainartaza.com
**Ashley E. Tremain**
Texas State Bar No. 24066209
ashley@tremainartaza.com
13140 Coit Rd., #104
Dallas, TX 75240
Direct: (469) 573-0297
Fax: (214) 254-4941

**COUNSEL FOR PLAINTIFF**